# Court of Appeals
## Tenth Appellate District of Texas

10-25-00041-CV

In the Interest of A.R.G., a Child

On appeal from the
County Court at Law No. 1 of Ellis County, Texas
Judge James S. Chapman, presiding
Trial Court Cause No. 112195CCL

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

**MEMORANDUM OPINION**

Following a bench trial, the parental rights of A.R.G.'s mother (Mother) were terminated.[1]  The trial court found by clear and convincing evidence that Mother had violated Family Code subsections 161.001(b)(1)(D), (E), (O), and (P) and that termination was in the child's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b).  In her sole issue, Mother contends that the trial court

---

[1] The parental rights of A.R.G.'s father were also terminated, but he has not appealed.

abused its discretion by terminating her parental rights because the evidence does not support termination.[2] We will affirm.

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). The trial court, as factfinder, is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department of Family and Protective Services (the Department) must establish by clear and convincing evidence two elements: (1) that the respondent parent committed one or more acts or omissions enumerated under subsection (b)(1), termed a predicate violation, and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re J.F.-G.*, 612 S.W.3d 373, 381 (Tex. App.—Waco 2020) (mem. op.), *aff'd*, 627 S.W.3d 304 (Tex. 2021). Proof of one element does not

---

[2] Mother does not specify whether her challenge is directed toward the legal sufficiency of the evidence, the factual sufficiency of the evidence, or both. Mother references the applicable standard of review for only legal sufficiency; however, in one section of the brief, she asserts more than once that the "evidence is legally and factually insufficient." The brief's prayer requests that we "reverse the trial court's ruling and grant any other or further relief to which [Mother] is entitled, including remand to the trial court to return the child to the Mother."

As for the Department, it has treated Mother's issue as a challenge to both the legal and factual sufficiency of the evidence. Construing Mother's brief liberally, we will also treat Mother's issue as a challenge to both the legal and factual sufficiency of the evidence. *See, e.g.*, *Okonkwo v. VE Westchase LLC*, No. 14-19-00935-CV, 2020 WL 7038401, at *1 (Tex. App.—Houston [14th Dist.] Dec. 1., 2020, no pet.) (mem. op.).

relieve the petitioner of the burden of proving the other. *J.F.-G.*, 612 S.W.3d at 381.

PREDICATE VIOLATIONS

Mother first contends that the evidence was insufficient to support the trial court's findings that she violated Family Code subsections 161.001(b)(1)(D), (E), (O), and (P). We begin with Mother's argument that the evidence was insufficient to support the trial court's finding that she violated subsection (E).

Termination under subsection (E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). To "endanger" means to expose the child to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The relevant inquiry under subsection (E) is whether sufficient evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied).

Scienter is not required for a parent's own acts to constitute endangerment under subsection (E). *See In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op.). It is

also not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* Furthermore, we may consider conduct both before and after the child's removal in an analysis under subsection (E). *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The relevant evidence presented in this case was as follows: Ennis Police Officer Sherman Swafford testified that he and another officer responded to the home of Mother's neighbors on September 16, 2023, after the neighbors called the police about a disturbance. Mother's neighbors had reported that a frantic Mother had arrived at their home with her two sons, A.L. and A.R.G., who were about four years old and just under one year old, respectively, at that time. Mother was saying that there were people chasing her and that she was in harm's way.

Officer Swafford testified that when he first arrived at the scene, his initial actions were to make sure that everyone was secure and that no one was chasing anyone or trying to harm anyone. When asked if he ascertained whether someone was chasing Mother, Officer Swafford answered:

> Yes, ma'am. We asked numerous times[,] and everything was extremely vague. [Mother] said that her phones had been hacked, her TV had been hacked, the kids' iPads had been hacked and people were following her and chasing her and spying on her. And at that point in time, it was pretty obvious to us that one of two

things was happening. It was either mental or drugs or all the above.

When further asked about his observations of Mother and the children at that time, Officer Swafford testified that the children looked healthy but that Mother and the children were "extremely dirty" and "smelly." When asked what he meant by "extremely dirty," Officer Swafford stated, "The odor was - - the only way I can really explain it is, if you took skunk and ammonia and mix it together and spray it. It would make your eyes burn. It was that bad. It was on all three of them."

Officer Swafford explained that he and his fellow officer subsequently followed Mother about six houses down to her own house. The officers wanted to secure the house, confirm that no one was out to get Mother, and assure that no one was hurt. Officer Swafford continued:

> When we got right in front of her house across the street, [Mother] falls down on the ground with the kids and is holding them on the ground, hollering, they're out to get us, and was referring to us, the police department. So she was freaking out. We finally got her back up, calmed her down. And at that point in time, we got her to release the kids to the family that was there to get them out of sight. We placed her in cuffs and put her in a squad car.

When asked if it appeared that Mother was responding to stimuli that were not present, Officer Swafford replied, "Oh, yeah. She was out there." But Mother denied taking any medications or drugs or having any mental problems at that time.

Officer Swafford testified that he and his fellow officer then asked Mother if they could go inside her home to make sure that everything was fine. Mother agreed. The door of Mother's home was unlocked, and Officer Swafford went inside. Officer Swafford stated that he would describe the environment inside the house as very dangerous to the children. More specifically, he described Mother's home as follows:

> I would say it looked like a bomb went off. There [were] clothes everywhere, food, TV's were unplugged. All the drawers in the kids['] rooms and her room were dumped out on the floor. The drawers were all pulled out. It really looked like a bomb had [gone] off in there. And the odor - - the odor was so bad it would make your eyes burn.

Officer Swafford and his fellow officer therefore decided to take the children to the police station and to take Mother to a mental facility for assistance.

Officer Swafford testified that he and his fellow officer first dropped off the children at the police station and that his fellow officer was then going to take Mother to the mental facility. Soon after the officer left with Mother, however, Mother slipped off her handcuffs, lay over in the backseat, and began wrapping the seatbelt around her neck. Mother also made several comments at that time about having nothing to live for. The officer stopped the car and put Mother back in the handcuffs and fastened her seatbelt. Mother was then taken to Ennis Regional Hospital instead of the mental facility because Mother

was going to hurt herself if they did not get her out of the back of the car, and Ennis Regional Hospital was less than a mile away.

When asked how the children had acted during all these events, Officer Swafford replied that the children acted like it was normal. Officer Swafford said that A.L. told the officers that he could call his father on his iPad. The officers were therefore able to talk to A.L.'s father, who said that he could be there in an hour to pick up his son. During that time, A.L. kept saying, "I'm sorry I stink." Officer Swafford apologized to him because Officer Swafford had been unable to find any clean clothes in Mother's home. A.L.'s father had to bring clean clothes for him.

Officer Swafford testified that another officer was able to buy some clean clothes for A.R.G., and the dispatchers cleaned and dressed him. Officer Swafford explained, however, "You could still smell the odor. It was like in their skin, in his hair. I mean we scrubbed him as much as we could[,] but you could still smell the odor on him when he left." Officer Swafford had tried to contact A.R.G.'s maternal grandmother, but she was in northern Arkansas and would not give them the name of A.R.G.'s father. When the officers had asked Mother about A.R.G.'s father, she had just looked down. Officer Swafford had therefore contacted the Department, and the Department took custody of A.R.G. that evening.

Amy Guerrero, an investigator for the Department, testified that she first made contact with Mother while Mother was at Ennis Regional Hospital. At that time, Guerrero asked Mother what had happened, and Mother told Guerrero that she was trying to contact her neighbor because she needed help. Mother did not elaborate about why she needed help. Guerrero then asked Mother about prior drug use, and Mother said that she had used drugs in the past but that she did not use drugs anymore. When Guerrero then asked Mother further questions about her prior drug use, Mother became irritated and refused to speak with Guerrero about it. Guerrero eventually asked Mother if she was willing to take an oral drug swab that she had. Mother declined, but she was willing to take a drug screen from the hospital. The urine screen that Mother took at the hospital was positive for cocaine and methamphetamine.

Joesi Shah, who had also been an investigator for the Department during that time, testified that she spoke with Mother a few days later. At that time, Shah asked Mother what had happened, and Mother told her that she had gone to reset an outlet at her home and that fumes had started coming out of the outlet. Mother said that she did not know if the fumes were poisonous, so she had run to the neighbor's house because someone was after her. Mother said that the neighbors thereafter called the police and that when law enforcement arrived, they took her to the hospital due to her erratic behavior and concerns

for her mental health. Shah testified that when she was speaking with Mother, Mother acknowledged that she had been experiencing hallucinations and paranoia. Mother also admitted to using cocaine and marijuana.

Dana Roberson, a conservatorship worker who was assigned this case in October or November 2023, testified that Mother also had prior involvement with the Department. Roberson explained that after being assigned this case, she discovered that she had been the conservatorship supervisor in a case in Dallas County regarding A.L. In the prior case, A.L. had been removed from Mother's care because he had tested positive for cocaine at birth. Roberson testified that Mother had nevertheless denied using drugs or having a substance abuse problem in the prior case. Mother had also taken several negative urinalyses throughout the prior case and had completed substance abuse treatment. But Mother had continued to test positive for amphetamines, methamphetamine, and cocaine on multiple hair-follicle drug tests throughout the prior case. And the prior case was eventually closed after the child's maternal grandmother was appointed as A.L.'s permanent managing conservator. Roberson stated that it had not been an option for Mother to be A.L.'s managing conservator because Mother was not able to show a period of sobriety.

Dachea Chumbley, a caseworker who was assigned to the present case in March 2024, testified that in the present case, Mother participated in a

psychological evaluation that showed diagnoses of "stimulant use disorder, other hallucinogen disorder, cannabis use disorder, problems related to interaction with CPS, personal history of partner violence with it being physical, and a history of traumatic loss within her family." Mother was therefore referred to Integrated Psychotherapeutic Services (IPS) for drug treatment. Chumbley stated that Mother thereafter completed the drug treatment but that she did not maintain sobriety while working through the drug treatment. Chumbley said that almost all of the many urinalyses that Mother took were negative but that, based on the hair follicle test results, it appeared that Mother had four relapses. Chumbley testified that all Mother's hair follicle tests returned positive results and that Mother then refused to submit to hair follicle tests after April 30, 2024, which violated court orders.

A parent's drug use may support termination under subsection (E). *See J.O.A.*, 283 S.W.3d at 345; *see also In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). And the parent's failure to remain drug free while her rights to her child are in jeopardy may also support a finding of endangering conduct under subsection (E). *See Vasquez v. Tex. Dep't of Protective & Regul. Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). In general, a parent's conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Mother points out that there was no evidence that she was ever arrested or had any criminal history, that almost every urinalysis drug test that she took came back negative, and that there was no evidence that A.R.G. had drugs in his system. Mother also attempts to explain the hair follicle test results by stating that it could have been due to her hairstyle. Mother further asserts that the hair follicle tests "were showing a downward trajectory with one relapse, but then again, a downward trajectory." Mother argues that her drug testing therefore showed that she was attempting to abstain from using all drugs and, thus, that the drug testing could not be sufficient to establish endangerment as there was no indication that the drug use was habitual or chronic. We disagree.

The evidence showed that the Department's first involvement with Mother was in June 2019 when A.L. tested positive for cocaine at birth. Mother thereafter continued to test positive for amphetamines, methamphetamine, and cocaine on multiple hair follicle drug tests throughout that case. And the conservatorship worker in that case testified that Mother was not able to show a period of sobriety during that case such that Mother could be an option to be A.L.'s managing conservator at that time. The evidence then showed that the Department became involved with Mother again because of the incident that happened in September 2023. A urine screen that Mother took at the hospital after the incident was positive for cocaine and methamphetamine. And after

that, Mother's hair follicle tests returned positive results until Mother simply refused to take the drug tests. When asked if Mother provided a reason for why she would not submit to hair follicle tests, the caseworker testified that Mother stated that she felt like her hair would always test positive for drugs because it was styled in locks. But the caseworker further testified that she has had other cases with people who have had locks and that they were able to have negative drug tests.

Considering the foregoing, we conclude that the evidence was legally and factually sufficient to establish that Mother engaged in conduct that endangered the physical or emotional well-being of A.R.G. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Moreover, having concluded that the evidence was legally and factually sufficient to support the trial court's finding that Mother violated subsection (E), we need not address Mother's arguments that the evidence was legally and factually insufficient to support the trial court's findings that she violated subsections (D), (O), and (P). *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam).

BEST INTEREST OF THE CHILD

Mother next contends that the evidence was insufficient to support the trial court's finding that termination was in the best interest of the child.

In determining the best interest of a child, several factors have been consistently considered, which were set out in the Texas Supreme Court's

opinion of *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* This list is not exhaustive but simply identifies factors that have been or could be pertinent in the best-interest determination. *Id.* at 372. There is no requirement that all these factors be proven as a condition precedent to parental termination. *See C.H.*, 89 S.W.3d at 27. The absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *Id.* In fact, while no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And evidence relating to the

predicate grounds under subsection 161.001(b)(1) may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

At the time of trial, A.R.G. was two years old. He therefore did not testify, but the evidence indicated that he was bonded to Mother. Mother further notes that A.R.G. is healthy and that he did not need any interventions when he was removed from her care. Mother also asserts that she "complied with all her services and was an appropriate caregiver to the child, with no concerns regarding her parenting skills – only the alleged lack of housing and alleged continued drug use, which was not actually shown in the drug testing results."

We agree that the evidence showed that Mother was generally completing her services in this case, but as discussed above, the evidence also indicated that Mother had been using illegal drugs over a period of years, despite participating in substance abuse treatment. And it is well established that a parent's use of illegal drugs and drug-related criminal activity may qualify as conduct that endangers a child's physical and emotional well-being. *In re A.R.C.*, 551 S.W.3d 221, 227 (Tex. App.—El Paso 2018, no pet.); *see J.O.A.*, 283 S.W.3d at 345. Furthermore, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see*

*also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage).

The evidence also showed that Mother had unstable housing throughout this case. Roberson testified that when she was the conservatorship worker on this case in late 2023, Mother said that she was staying with a friend. Mother, however, did not intend for that place to be an option for A.R.G.'s return, so Roberson was never able to see it. Instead, Mother said that she was going to be looking to get her own apartment. Caseworker Chumbley testified that before October 2024, Mother had then told her that she was staying with her sister-in-law in Dallas. It was a residence that Mother wanted to be considered as an option for A.R.G.'s return, but although Chumbley asked to see the home several times, Mother never made it available to Chumbley to assess for safety and appropriateness.

Chumbley testified that in October 2024, Mother then secured a residence at an extended-stay hotel/apartment, and Chumbley was able to visit the residence in October and December. The CASA testified that she was also able to visit the home twice. The CASA stated that during the first visit, she observed that the home was clean and that there was no smell. The CASA testified that she felt that it would have been an appropriate place for A.R.G.

to live if the conditions continued to be the way that they were during that visit. The CASA stated that during her second visit, however, while the home still appeared visually clean and appropriate, there was a strong smell of body odor. The CASA explained that this concerned her because Mother had had similar issues in the home where she had been living at the outset of this case, over a year before.

Chumbley then testified that based on Mother's testimony at a hearing to consider a motion for monitored return that had been held the week before the January 30, 2025 trial, it had been Chumbley's understanding that Mother was still residing at the extended-stay property. In late December 2024 and in January 2025, Chumbley had returned to Mother's home for additional visits. No one had answered the door at those times. When Chumbley followed up with Mother, Mother asked Chumbley why she was just popping up at her house and told Chumbley that she had just not been at home at those times. But Chumbley recently learned that Mother had not been living at the extended-stay property since December 2024. The general manager of the extended-stay property testified that Mother had been given a notice to vacate the property by noon on December 17, 2024, because Mother had been paying her rent late and had then caused a disturbance in the office. The general manager further stated that when they checked Mother's apartment on

December 18, 2024, Mother had taken her things and left. The CASA explained that this was extremely concerning

> [b]ecause if [Mother] had had [A.R.G.] returned to her two weeks ago, we now know that we would have had no idea where he was living, if he was safe, clean, cared for, we would have no way of knowing and he's two and cannot ask for help and cannot advocate for himself.

Chumbley additionally expressed her concerns that she was unaware of any plan or routine that Mother had for A.R.G. if he were to be returned to her. On the other hand, A.R.G.'s foster mother testified that she and her husband would like to adopt A.R.G. into their family and to provide him a long-term home. *See In re J.D.*, 436 S.W.3d 105, 119–20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined."). At the time of trial, A.R.G. had been in the current foster family's home for a little over a year, and the evidence indicated that A.R.G. was bonded to the foster family. *See A.R.C.*, 551 S.W.3d at 227 ("The need for permanence is a paramount consideration for a child's present and future physical and emotional needs."). The CASA testified that when A.R.G. first entered foster care, she was concerned that he was unable to self-soothe or to follow a schedule. But the CASA stated that at the time of trial, A.R.G. was "absolutely thriving" with his foster family.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, considering all the evidence here in the light most favorable to the trial court's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in A.R.G.'s best interest.

In light of the foregoing, we overrule Mother's sole issue and affirm the trial court's order of termination.

_____

MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED:  June 26, 2025

Before Chief Justice Johnson,
     Justice Smith, and
     Justice Harris
Affirmed
CV06

